MICHAEL W. YOUNG, USB #12282
LAUREN M. HUNT, USB # 14682
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  801.532.1234
Facsimile:  801.536.6111
MYoung@parsonsbehle.com
LHunt@parsonsbehle.com
ecf@parsonsbehle.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| KAYTRIAUNA FLINT,<br><br>    Plaintiff,<br><br>vs.<br><br>UTAH STATE UNIVERSITY<br><br>    Defendant. | **COMPLAINT AND JURY DEMAND**<br><br>Case No.  1:21-cv-00167-DAO<br><br>Magistrate Judge Daphne A. Oberg |

## SUMMARY OF CASE

In a damning report, the United States Department of Justice concluded that USU repeatedly mishandled cases of sexual assault on campus, failed to investigate when it knew about misconduct and, as a result, "rendered additional students vulnerable,"[1] after a three-year investigation into the school, which concluded in 2020. "Severe sexual harassment, including rapes and other forcible sexual assaults, went unaddressed and students who were subjected to sexual

---

[1] U.S. Dept. of Just., Title IX Investigation of Utah State University, DJ 169-77-25, SS:FM:VL:AD, Oct. 2, 2019, at 5.

harassment often suffered negative academic, mental health, and social consequences, including withdrawal from their classes or from the University altogether."[2] The DOJ uncovered "significant" failures in how USU responded to complaints, particularly in the school's treatment of football players, fraternities, and the music department.[3] USU President, Noelle Cockett, responded to the DOJ's report in 2020, stating that "Utah State should have done better…I should have done better."[4] President Cockett pledged to "expand [USU's] ongoing efforts to prevent and respond to sexual misconduct and correct the gaps and shortcomings in our processes."[5] Despite that acknowledgment and explicit promise *to do better*, USU is not only *still* failing to uphold its obligations under Title IX, *still* giving preferential treatment to male athletes accused of sexual misconduct but, most egregiously, blatantly ignoring binding federal caselaw and Department of Education guidance on proper investigative procedures in order to deprive victims of their rights and protections, as in the case of Kaytriauna Flint.

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Kaytriauna Flint was at all relevant times a resident of the State of Utah.

2.      USU is an institution of higher education located in Logan, Utah.

3.      At all relevant times, USU received Federal financial assistance and was therefore subject to the requirements of Title IX of the Education Amendments of 1971, 20 U.S.C § 1681 et seq. ("Title IX").

---

[2] *Id.* at 2.

[3] *Id.*

[4] Courtney Tanner and Jessica Miller, *Justice Department says Utah State mishandled sexual reports—often leaving 'additional students vulnerable.',* (Feb. 12, 2020, 4:17 p.m.), https://www.sltrib.com/news/education/2020/02/12/utah-state-university/

[5] *Id.*

4859-5993-3188.v1

4.      Plaintiff alleges claims against USU under Title IX. Jurisdiction is therefore appropriate in this Court pursuant to 28 U.S.C. § 1331.

5.      Defendant resides in the state of Utah, and the events or omissions giving rise to Plaintiff's claims occurred in the state of Utah. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

**USU's Culture of Preferential Treatment toward Men and Male Athletes**

6.      Statistics show that male college athletes are more likely than the average male college student to commit sexual assaults.[6]

7.      According to one study, male athletes commit one-third of all sexual assaults on college campuses.[7]

8.      Of those athletes committing these assaults, the majority are either football or basketball players.[8]

9.      In short, male football and basketball players are among the most likely perpetrators of sexual violence and assault against women on college campuses.

---

[6] Jenni E. Spies, *Winning at All Costs: An Analysis of a University's Potential Liability for Sexual Assaults Committed by Its Student Athletes*, 16 Marq. Sports L. Rev. 429, 430 (2006) (citing Nat'l Coalition Against Violent Athletes, Prevention Programs, http://www.ncava.org/prevention.html (last visited Apr. 17, 2006)).

[7] *Id.*

[8] *Id.* (citing *See, e.g.*, Carol Bohmer & Andrea Parrot, *Sexual Assault on Campus: The Problem and the Solution* 21 (1993). *See also* Thomas N. Sweeney, Comment, *Closing the Campus Gates - Keeping Criminals Away from the University - The Story of Student-Athlete Violence and Avoiding Institutional Liability for the Good of All*, 9 Seton Hall J. Sport L. 226, 230 (1999).

4859-5993-3188.v1

10.     At USU specifically, the DOJ investigation found that it was common for USU to close incident files involving football players after only "minimal investigation."[9]

11.     There were "several players" accused of multiple incidents of sexual misconduct during the time included in the DOJ investigation, according to the DOJ report.[10]

12.     Since the conclusion of the DOJ investigation, at least one USU football player has been formally charged with rape and as explained more fully *infra*, Plaintiff was raped by a yet another different football player.

13.     Clearly, USU has not taken concrete enough steps to stem assault and harassment by football players. In fact, USU athletics coordinates with the campus and local police departments in order to establish protocol for football players to receive preferential treatment in the wake of criminal allegations.

14.     In fact, a meeting between the USU Chief of Police, Logan Chief of Police, Assistant Chief of Logan Police, and the football team was recorded in August 2021.

15.     The Chief of Logan Police told the football team that local law enforcement wants the team "to play ball" and that law enforcement will "work with [them]" if they were alleged to have committed a crime.

16.     The Assistant Chief of Logan Police gave every player his personal cell phone number for them to call if they found themselves in criminal or legal trouble, allowing the players to say, "I'm asking for a friend…" and get legal advice from the police.

---

[9] *Supra* note 1, at 9.
[10] *Id.*

4859-5993-3188.v1

17.     The Assistant Chief of Logan Police assured the players that the press is not their friend, and law enforcement would not notify the press if any player got in trouble.

18.     The Chief of USU Police told the players that they couldn't personally fix their tickets, but they would direct them to someone who could.

19.     The Chief of USU Police told the team that he "will work with [the USU coach]."

20.     The Chief of USU Police told the players if they were caught underage drinking to have the coach call him.

21.     The Chief of USU Police told the team that they lived in a "Mormon community" and that Church leaders will ask women whether sex was consensual. He told the team that it is easier for women to tell Church leaders that sex was non-consensual, and the police would be "forced" to initiate an investigation.

22.     The Chief of USU Police told the team that "we're gonna take care of you no matter what," and the officers "just want [the team] to play good football."

23.     In a separate meeting (also recorded) with the football team in August 2021, the football coach, USU's Title IX coordinator, and a representative from the USU Sexual Assault and Anti-Violence Information ("SAAVI") office, the coach told the team it "has never been more glamorized to be a victim" and that the football team was a "target to some."

**Institutional Betrayal and the Exacerbation of Trauma**

24.     Emerging research shows that the way in which institutions respond to traumatic events experienced by individuals can profoundly affect such individuals. Where an institution betrays an individual's trust, e.g., by responding to a claim of sexual assault with harassment and

insensitive investigation practices, an individual will likely experience enhanced psychological distress.[11]

25.     Researchers have previously observed that interpersonal trauma perpetrated within a close relationship is more harmful than interpersonal trauma perpetrated by a stranger.[12] Accordingly, betrayal trauma is associated with higher rates of several outcomes including post-traumatic stress disorder, anxiety, depression, and borderline personality disorder.[13]

26.     When a victim reaches out to an institution for help in the wake of a traumatic experience, they place a great deal of trust with that institution.

27.     Institutional betrayal is a form of betrayal trauma that occurs where an institution has violated an individual's trust in a way that exacerbates the impact of a victim's traumatic experience.[14]

28.     As a form of betrayal trauma, institutional betrayal is also associated with a number of complex outcomes similar to those experienced by victims of interpersonal trauma. "When measured directly, the exacerbative effects of institutional betrayal on psychological well-being are clear and consistent with betrayal trauma theory: higher rates of disassociation (Figure [Below]), anxiety, sexual dysfunction, and other trauma related outcomes."[15]

---

[11] *See generally*, Carly Parnitzke Smith & Jennifer J. Freyd, *Institutional Betrayal*, 69 American Psychologist 575 (September 2014).
[12] *Id.* at 577 (citing Freyd, J. J., *Betrayal Trauma: The Logic of Forgetting Childhood Abuse*, Cambridge, MA: Harvard University Press (1996)).
[13] *Id.* (citing Freyd, J. J., & Birrell, P. J.. *Blind to Betrayal,* New York, NY: Wiley (2013)).
[14] *Id.*
[15] *Id.* at 577-78.



29.     In institutions where leaders are engendered with an elevated role or position, institutional betrayal is more likely to occur.[16]

**Title IX and Its Requirements**

30.     Title IX mandates that no person shall, "on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance."[17]

---

[16] *Id.*

[17] 20 U.S.C. § 1681(a) (Sexual harassment, which includes unwanted sexual advances, rape, and/or sexual assault is prohibited by Title IX, *see supra.*)

**2001 Dear Colleague Letter**

31.     The 2001 Dear Colleague Letter emphasized from the outset the fundamental observation that "preventing and remedying sexual harassment in schools is essential to ensuring a safe environment in which students can learn."[18]

32.     The 2001 guidance also emphasized the fact that a school is obligated to act when sexual harassment or violence has occurred.  The school must take affirmative steps to "end the harassment, prevent its reoccurrence, [and] remedy its effects. If harassment has occurred, doing nothing is always the wrong response."[19]

33.     Title IX is broad in application and protects students whether the offending conduct occurred at facilities of the school, a class, a training location, or elsewhere.[20]

34.     Governmental regulations implementing Title IX prohibit, on the basis of sex, giving one student or a group of students preferential treatment in receiving aid or subjecting students to separate or different rules of behavior. This would include instances where a female student is punished differently than a male student for similar violations of a school's disciplinary codes or standards of behavior.[21]

35.     Additionally, a series of seemingly unrelated events or incidents at a school can—taken together—create a hostile environment. Assessment of the totality of the circumstances is critical in determining whether a hostile environment exists.[22]

---

[18] 2001 Dear Colleague Letter at ii.
[19] *Id.* at iii.
[20] *Id.* at 3.
[21] *See, e.g., Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994).
[22] 2001 Dear Colleague Letter at 11.

36.     Once a school has notice of an instance of harassment or an individual harassing other students, the school is obligated to take immediate and effective action to stop and remedy the harassment. If a school receives notice and "the school fails to take prompt, effective action, the school's own inaction has permitted the student to be subjected to a hostile environment. . . ."[23]

37.     Sexually harassing activities from third parties will also trigger a school's obligation to take effective remedying action.[24]

38.     A school can receive "notice" in many different ways, including directly from a student or a student's parent, or indirectly from the media or local community members. A school has a responsibility to investigate and make a "reasonably diligent inquiry" when receiving information about harassment.[25]

39.     In order to facilitate the reporting of incidents of sexual harassment, the school should have a publicized grievance procedure that is tailored to discover sexual harassment as early as possible and that is applied fairly.[26]

40.     Once a school has received notice of harassment, the school is required to take steps to investigate and remedy the harassment regardless of whether a formal complaint has been made.[27]

41.     Ultimately, the 2001 Dear Colleague Letter established a baseline approach to Title IX implementation that required schools to be proactive in taking a victim-centered approach to Title IX issues.

---

[23] *Id.* at 12.
[24] *Id.*
[25] *Id.* at 13.
[26] *Id.*
[27] *Id.* at 15.

**2008 Dear Colleague Letter**

42.     The 2008 Dear Colleague Letter was written as a supplement to the guidance provided in the 2001 Dear Colleague Letter.[28]

43.     As an initial matter, the 2008 guidance unequivocally notes that sexual violence is a form of sexual harassment prohibited by Title IX. The guidance also expressly notes that "a single instance of rape is sufficiently severe to create a hostile environment."[29]

44.     Noting the prevailing requirement for a school to take immediate action when it knows, or should know, about student-on-student harassment, the 2008 guidance also reinforces the notion that a school must remedy the effects of such harassment even if it took place off campus.[30]

45.     In addition to underscoring the obligations of a school previously outlined in the 2001 guidance, the 2008 Dear Colleague Letter provides concrete direction on what a school must do to comply with Title IX's requirements.  For example, the 2008 guidance expressly notes that a school must have a Title IX coordinator and that the coordinator must not have other duties or responsibilities that might create a conflict of interest. The guidance specifically notes that it would be inappropriate to have a Title IX coordinator who also had disciplinary or legal responsibilities.[31]

46.     The guidance also requires training for school law enforcement personnel, noting that "all school law enforcement unit employees should receive training on the school's grievance procedures and any other procedures used for investigating reports of sexual violence."[32] Of

---

[28] 2008 Dear Colleague Letter at 2.
[29] *Id.* at 3.
[30] *Id.* at 4.
[31] *Id.* at 7.
[32] *Id.* at 7, 17.

4859-5993-3188.v1

course, such procedures must necessarily comply with Title IX requirements generally. It is also clear that the training must be done on a recurring and regular basis.[33]

47.     Grievance procedures should not require a victim to work out the issue directly with the alleged perpetrator.  Instead, the procedures should allow the victim to receive prompt and equitable resolution.[34]

48.     With respect to student athletes, the 2008 guidance expressly states:

> These procedures must apply to all students, including athletes.  If a complaint of sexual violence involves a student athlete, the school must follow its standard procedures for resolving sexual violence complaints.  <u>Such complaint must not be addressed solely by the athletics department procedures</u>.[35]

49.     The 2008 Dear Colleague Letter also outlines proactive measures a school should take in order to comply with Title IX.  Such measures include preventative education programs, providing victims resources and services, orientating programs, and training for student athletes and coaches.[36]

50.     With respect to a school's investigative responsibilities, a school must, in the course of investigating an instance of sexual violence, evaluate if other students have been victimized, investigate whether school employees knew or should have known of the misconduct, and initiate with student leaders a "climate check" to assess the effectiveness of the school's efforts in complying with Title IX.[37]

---

[33] *Id.* at 18.
[34] *Id.* at 8.
[35] *Id.*
[36] *Id.* at 14.
[37] *Id.* at 18.

11

**Trump Administration Changes to Title IX**

51.     In 2017, the Trump Administration rescinded other subsequent Obama-era guidance documents that had been issued in 2011, 2013, 2014, and 2016, but did not rescind the 2001 and 2008 Dear Colleague Letters.

52.     The Trump Administration issued interim policies in September 2017 for schools to follow until its Final Rules took legal effect in August 2020.

53.     These interim policies made clear that a school must adopt and publish a grievance procedure that provided for prompt and equitable resolution of complaints.

54.     Notably, Trump's interim policies *did not* require a hearing: "[t]he investigator(s), or separate decision-maker(s), with or without a hearing, must make findings of fact and conclusions as to whether the facts support a finding of responsibility for violation of the school's sexual misconduct policy."[38]

55.     The Trump Administration's Final Title IX Regulations did not take legal effect until August 14, 2020.

56.     Among other substantial changes, Trump's Final Regulations mandated that parties and any witness submitting evidence be subject to cross-examination at a live hearing for the witness's evidence or statements to be considered.[39]

---

[38] U.S. Dept. of Ed., Q&A on Campus Misconduct, (September 2017), at 5, available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=
[39] 34 CFR § 106.45(b)(6)(i)

57.     Many victim advocacy groups criticized the requirement for cross-examination as giving special rights to the accused, "while undermining the girls and women who come forward."[40]

**Federal Court Finds Cross-Examination Requirement "Arbitrary and Capricious"**

58.     In July 2021, United States District Court Judge William G. Young in *Victim Rights Law Center et al. v. Miguel Cardona et al.* largely upheld the 2020 amendments to Title IX promulgated by the Trump Administration but, ***crucially,*** found fault in Section §106.45(b)(6)(i), which prohibited decision-makers at postsecondary institutions from considering any "statement" whose declarant did not appear at a live Title IX hearing and subject himself or herself to cross-examination.[41]

59.     The Court found that the original provision of the Final Rule would ban police reports, medical history, admissions by a respondent, and statements from anyone who had witnessed the incident, that either could not attend the hearing or were dissuaded from attending the hearing by the respondent.[42]

60.     The Court concluded that any competent attorney would inform her respondent-client to simply not attend the hearing, thereby suppressing any inculpatory statements the respondent had made to police or third parties.[43]

---

[40]     *Trump    Administration    Sued    Over    Title    IX    Guidance,*    available    at https://youthlaw.org/publication/trump-administration-sued-title-ix-guidance/
[41]     *Victim Rights Law Ctr. v. Cardona*, No. 20-11104-WGY, 2021 U.S. Dist. LEXIS 140982, at *49 (D. Mass. July 28, 2021)
[42]     *Id.*
[43]     *Id.*

4859-5993-3188.v1

61.     The Court stated that a respondent "could. . .rest easy knowing that the school could not subpoena other witnesses to appear, despite the school bearing the 'responsibility for reaching an accurate determination regarding the responsibility while maintaining impartiality.'"[44]

62.     The Court concluded that the prohibition of absentee statements rendered the hearing a "hollow exercise" and that the Department [of Education] "failed, even implicitly, to consider the consequences from the prohibition and definition of statements."[45]

63.     The Court ruled that this provision was "arbitrary and capricious" under the Administrative Procedure Act, **vacated the provision nationwide**, and remanded it to the Department of Education for further consideration and explanation.[46]

64.     On August 24, 2021, the Department of Education issued a letter to students, educators, and other stakeholders wherein it announced that "in accordance with the Court's order, the Department will immediately cease enforcement of the part of §106.45(b)(6)(i) regarding the prohibition against statements not subject to cross-examination. Postsecondary institutions are no longer subject to this portion of the provision."[47]

65.     The Office of Civil Rights explained that "[i]n practical terms, a decision-maker at a postsecondary institution may now consider statements made by parties or witnesses that are otherwise permitted under the regulations, even if those parties or witnesses do not participate in

---

[44] *Id.* (internal citation omitted).

[45] *Id.*

[46] *Victim Rights Law Center et al. v. Cardona* (Order on Motion for Clarification, Aug. 10, 2021, Dock. 1:20-cv-11104). Available at https://www.courtlistener.com/docket/17238997/186/victim-rights-law-center-v-devos/

[47] Letter to Students, Educators, and other Stakeholders re *Victim Rights Law Center et al. v. Cardona,* Aug. 24, 2021, at 1. available at https://www2.ed.gov/about/offices/list/ocr/docs/202108-titleix-VRLC.pdf

14

cross-examination at the live hearing, in reaching a determination regarding responsibility in a Title IX grievance process."[48]

66.     Therefore, after August 24, 2021, decision-makers could then "consider statements made by the parties and witnesses during the investigation, emails and text messages exchanged between the parties"[49], and other statements concerning the alleged sexual harassment regardless of whether the declarants appeared or submitted to cross-examination at the live hearing, as long as they are relevant. Moreover, decision-makers could "also consider police reports, Sexual Assault Nurse Examiner documents, medical reports, and other documents"[50] even if they contain statements of a person who was not cross-examined or did not attend the hearing.

**Additional Legal Requirements and Private Enforcement Under Title IX**

67.     An institution may be liable for civil penalties if it has not upheld its legal obligations under Title IX.

68.     An institution like USU may be liable for violating Title IX where the institution acts with deliberate indifference to known acts of harassment, acts in retaliation, or has policies that create a disparate impact on one gender, amongst other ways.

**a.  Deliberate Indifference**

69.     "Deliberate indifference to known acts of harassment . . . amounts to an intentional violation of Title IX, capable of supporting a private damages action."[51]

---

[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643 (1999) (citing *Gebser v. Lago Vista Independent Sch. Dist.*, 524 U.S. 274 (1998).

70.     This includes harassment both by the school itself and by other students, as long as "the funding recipient has some control over the alleged harassment."[52]

71.     The Tenth Circuit has interpreted Supreme Court precedent to create a four-factor test for liability for deliberate indifference. A plaintiff "must allege that the [institution] (1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school."[53]

72.     Deliberate indifference may be demonstrated by a school's "respond[ing] to known . . . harassment in a manner that is clearly unreasonable."[54]

73.     Whether a response is "clearly unreasonable" is a question of fact and is intended to be flexible.[55]

74.     Nevertheless, where a university "knowingly refuse[s] to take any action in response to the behavior, such as investigating or putting an end to the harassment, or refuse[s] to take action to bring the recipient institution into compliance," the school has demonstrated deliberate indifference giving rise to liability.[56]

75.     A school "intentionally subject[s] students to harassment" when it "deliberately decide[s] not to take remedial action."[57]

---

[52] *Id.* at 644.
[53] *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1246 (10th Cir. 1999) (citing *Davis*).
[54] *Davis,* 526 U.S. at 649.
[55] *Id.*
[56] *Papelino v. Albany College of Pharmacy of Union Univ.*, 633 F.3d 81, 90 (2d Cir. 2011) (internal punctuation omitted) (quoting *Davis*, 526 U.S. at 651, 654; *Gebser*, 524 U.S. at 290).
[57] *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007) (emphasis in original) (citing *Davis*, 524 U.S. at 290).

4859-5993-3188.v1

76.     Severity can also be established by a single incident. "The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the harassment is physical. Indeed, a single or isolated incident of sexual harassment may create a hostile environment if the incident is sufficiently severe."

77.     For instance, "a single instance of rape is sufficiently severe to create a hostile environment."[58]

**b.  Retaliation**

78.     A plaintiff establishes retaliation under Title IX by showing "(1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action."[59]

79.     Filing a complaint of discriminatory activity or harassment is a protected activity.[60]

80.     Demonstrating a causal connection between the protected activity and the adverse action is a question of fact, which applies the *McDonnell Douglas* burden-shifting framework.[61]

81.     First, the plaintiff must establish a prima facie case of discrimination. Once the plaintiff has established a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions.[62]

---

[58] *Jennings v. Univ. of N.C.*, 444 F.3d 255, 268, 274 n.12 (4th Cir. 2006); *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 259 n.4 (6th Cir. 2000); *Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999); *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 692 (7th Cir. 2010); *Turner v. Saloon, Ltd.,* 595 F.3d 679, 686 (7th Cir. 2010); *McKinnis v. Crescent Guardian, Inc*., 189 F. App'x 307, 310 (5th Cir. 2006).
[59] *Papelino*, 633 F.3d 81, 92 (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998)).
[60] *See, e.g.*, *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 563-64 (3d Cir. 2017); *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 867 (9th Cir. 2014); *Papelino*, 633 F.3d at 92.
[61] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).
[62] *Id.*

82.     If the defendant is able to do so, the burden shifts back to the plaintiff to show that the defendant's articulated reasons were pretextual.[63]

83.     "The burden on a plaintiff to show a prima facie case of retaliation is low. Only 'a minimal threshold showing of retaliation is required.'"[64] Indeed, "Close temporal proximity between the plaintiff's protected activity and the . . . adverse action may in itself be sufficient to establish the requisite causal connection."[65]

84.     The proof necessary for a prima facie case "does not even need to rise to the level of a preponderance of the evidence."[66]

### c.  Disparate Impact

85.     Disparate impact claims are permissible in Title IX litigation and enforcement. The Department of Justice's Title IX legal manual states that a disparate impact violation occurs when "a recipient violates agency regulations by using a neutral procedure or practice that has a disparate impact on protected individuals, and such practice lacks a substantial legitimate justification."[67]

86.     Even if a legitimate justification exists, the recipient must also show that there are no "equally effective alternative practices that would result in less adverse impact."[68]

---

[63] *Id.*

[64] *Ollier*, 768 F.3d at 867 (quoting *Emeldi v. Univ. of Oregon*, 698 F.3d 715, 724 (9th Cir. 2012)).

[65] *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).

[66] *Emeldi*, 698 F.3d at 724 (quoting *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008)).

[67] U.S. Dep't of Justice, Title IX Legal Manual, § IV(A)(2), *available at* https://www.justice.gov/crt/title-ix.

[68] *Id.* (internal quotation marks removed).

4859-5993-3188.v1

87.     Courts have found that "practices, procedures, or tests neutral on their face, and even neutral in terms of intent," may be discriminatory if they result in differing outcomes based on gender.[69]

88.     Disparate impact is something for which a plaintiff may seek injunctive relief.

**Plaintiff Kaytriauna Flint**

89.     Kaytriauna ("Kaytri") Flint was raped by a USU student/football player on November 26, 2019.

90.     Kaytri had a Code-R examination performed in Montana (where she had gone to visit her dad), the day after she was raped, which noted bruises on her thigh, and lacerations and abrasions on her labia.

91.     Kaytri reported the assault to the police within days of her assault.

92.     On December 3, 2019, Kaytri reported the rape to the Title IX office at USU.

93.     At the time Kaytri was raped and reported to the USU Title IX office, Trump's interim policies were in effect, which did not mandate a hearing or the cross-examination of witnesses.

94.     The USU Title IX office began its investigation in January 2020. During the investigation process, Kaytri had to switch between multiple investigators and had to give multiple interviews due to the investigators losing recordings and other evidence.

---

[69] *Griggs v. Duke Power Co.*, 401 U.S. 424, 430 (1971) (interpreting Title VII); *Roberts v. Colo. State Bd. of Agric.*, 997 F.2d 824, 832-33 (10th Cir. 1993) (finding no error in district court's "failing to require proof of discriminatory intent"); *Women Prisoners of District of Columbia Dep't of Corrections v. District of Columbia*, 877 F.Supp. 634, 674 n.49 (D.D.C. 1994), *vacated in part on other grounds* 899 F.Supp. 659 (D.D.C. 1995) (finding "no requirement of [discriminatory] intent" in Title IX's implementing regulations).

4859-5993-3188.v1

95.     Kaytri was told by a Title IX representative to avoid areas of campus in order to feel safe—such as the library, the section of campus in which most her classes were located, and the student center.

96.     At one point, Kaytri was told by a Title IX investigator that it would probably be easiest if she left the school.

97.     Despite the burden being "on the school—not on the parties—to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct occurred," the Title IX investigator was unable to obtain Kaytri's Code-R exam records from either the police or the hospital and asked Kaytri to obtain the records.

98.     The Title IX investigator told Kaytri that the hospital had not been responsive, and the school could not force production. He asked Kaytri if "she thought they could get anything from the records that [Kaytri] could explain, but if [Kaytri] [did not] respond by March 23, [he would] assume [she] had nothing for him to consider."

99.     Kaytri then tried to obtain her own records.

100.    Despite the absence of the Code-R records, the Title IX Draft Report issued on March 21, 2020, concluding that both Kaytri and her assailant were credible and therefore "there was not a preponderance of the evidence to support Complainant's claims of Sexual Assault."

101.    According to USU policy 305.4.3.2, both parties had ten days to respond to the Draft Report.

102.    Kaytri wrote a response to correct inaccuracies in the Draft Report. After much difficulty, Kaytri had then been able to collect her Code-R examination records from the hospital

20

(with the exception of the photographs taken of her genitalia, which the hospital would not disseminate). She submitted the available Code-R documentation for consideration.

103.    Kaytri's assailant did not respond to the Draft Report.

104.    On May 29, 2020, the Final Report issued, concluding that there was preponderance of the evidence that a policy violation had occurred for Sex Assault (intercourse). The Final Report noted that the Code-R exam injuries supported Kaytri's version of events; although injury could result from consensual activity, "Complainant and Respondent provide[d] radically different accounts of this incident with Complainant stating respondent was aggressive and physical while Respondent claim[ed] he was checking in with Complainant and always aware of he had consent. It is more likely, given the Code-R exam, that Complainants account is credible."

105.    Kaytri's assailant appealed the finding in the Final Report, stating he did not have an opportunity to respond to the Code-R evidence.

106.    On July 8, 2020, the Appeal Panel conducted a closed hearing, during which Kaytri, her assailant, and Title IX Coordinator Hilary Renshaw all gave statements and were questioned by the other parties and the Panel.

107.    Kaytri's assailant had an opportunity to respond to the available Code-R evidence at this closed hearing.

108.    In July of 2020, the Appeal Panel then issued a written report of findings, conclusions, and recommendations, stating that a reasonable fact finder could conclude that the allegations of violations of USU policies 305 and/or 339 were supported by a preponderance of the evidence available to the Panel. The Panel also concluded that there were no procedural errors that "so significantly impacted the investigation as to substantially prejudice its outcome" and

recommended that no modification be made to the Final Report. According to USU policy, the University President then must review the findings of the Appeal Panel.

109.    On August 14, 2020, the Trump Administration Title IX Final Rules took legal effect.

110.    Kaytri then went *five months* without hearing from any USU administration or Title IX employees, except the administrative person who was helping her coordinate supportive measures.

111.    During the five months after the Appeal Panel accepted the findings of Kaytri's rape, Kaytri still had to attend school with her assailant, watch her assailant play on the football team and receive no consequences, and she continued to fall very behind in her classes and suffered severe mental health consequences.

112.    After five months of no progress in the case and no substantive contact from the Title IX office, on December 2, 2020 Kaytri emailed the Title IX Coordinator, the Vice President of Student Affairs, the Executive Director, the Director of Student Conduct, the Student Conduct and Wellness Coordinator, and the University President that she had been failed by the University, that she had multiple investigators from Title IX, nothing had been done, that she was extremely angry that her assailant was still allowed to play football, and that the University needed to act on the findings from the Appeal Panel.

113.    On December 2, 2020, the Title IX Coordinator Hilary Renshaw responded to Kaytri, saying that USU takes sexual misconduct very seriously and reminded her about the availability of supportive measures.

114.    On December 4, 2020, USU President Noelle Cockett issued a Memorandum in which she summarized the procedural posture up to that point and recognized that the Appeal Panel found no procedural errors. However, she stated that Kaytri's assailant had a protected property interest at stake and therefore due process applied. She concluded that he was not given a meaningful opportunity to respond to the Code R evidence (even though he was permitted to address the evidence during the closed Appeal Panel hearing).

115.    The President remanded the entire case to the Office of Equity to "allow all parties to respond to all the evidence" that was then in the record.

116.    Kaytri was assigned yet another new Title IX investigator.

117.    On February 17, 2021, a Title IX employee emailed Kaytri to ask her about her potential interest in an "informal resolution."

118.    Kaytri responded that she had recently suffered a concussion, was having a hard time understanding what an informal resolution meant, and that she wanted to meet.

119.    Kaytri attended a meeting about the informal resolution process and was given a form outlining it. The form stated the process was voluntary, that either party could withdraw at any point before signing any agreement, and if they withdrew, the "formal investigation would be resumed."

120.    Despite Kaytri having a concussion that affected her ability to understand the Informal Resolution process, and despite telling her USU SAAVI advocate that she did not want to participate in the Informal Resolution process, the process was initiated.

121.    The parties attempted to agree on terms for an Informal Resolution but were unable to do so, partly because the only terms Kaytri's assailant was willing to agree to were non-

23

substantive, did not effectively deal with the issue at hand, and included things such as "he will listen to a podcast episode about sexual assault."

122.   On May 4, 2021, the Title IX Coordinator emailed Kaytri that since the parties could not agree on an Informal Resolution, "the Office views this request [to resume the formal investigation] as a 'request for investigation filed or made subsequent to August 14, 2020' and that the new procedures will apply."

123.   This meant that, despite Kaytri being raped and her Title IX investigation being initiated well before the Trump Administration Final Rule took effect, and despite being told that the formal investigation would "resume" instead of start over completely if the Informal Resolution failed, USU unnecessarily subjected Kaytri to the new policies that were greatly detrimental to her case and wellbeing.

124.   For instance, under the new Trump Administration Final Rule, Kaytri would now have to attend a hearing at which her assailant and his attorney were present and be subject to cross-examination by his attorney. Additionally, Kaytri's Code-R examination and police report evidence would now be inadmissible if she was unable to procure her forensic nurse (from another state) and the police officers to come testify at her hearing, something that she *could not do* without a court subpoena—a power that she did not have.

125.   Despite knowing she had absolutely no power or ability to do so, USU continued to email Kaytri about her need to secure her forensic nurse to attend the hearing. Kaytri kept attempting to work with the hospital, despite the onus being on USU to gather the evidence to reach a determination.

126.    USU Title IX Coordinator Hilary Renshaw reached out to Kaytri to inform her that Kaytri's assailant had now requested to view the photographs of Kaytri's genitalia that were taken as part of the Code-R examination and asked Kaytri to obtain and submit them to the Title IX investigation record.

127.    Sexual Assault Nurse Examiners (SANE) nurses, as a matter of policy, do not release these highly sensitive and personal photographs of people's genitalia without a court order, and never release them to an alleged assailant or defendant. Nevertheless, USU Title IX asked Kaytri to obtain the photographs so they could share them with her assailant.

128.    Despite being incredibly offended that USU was attempting to secure photographs of her genitalia to provide to her rapist, Kaytri still attempted to obtain them for her investigation; she spoke with her SANE nurse and the nurse's supervisor and was told they could not release the photographs to her.

129.    On July 28, 2021, a federal court struck down as arbitrary and capricious and vacated the provision of Trump's Final Rule (Section 106.45(b)(6)(i)) that mandated witnesses attend and be subject to cross-examination at a hearing for their statements to be considered.[70]

130.    The court clarified that the vacation of this provision applied nation-wide.

131.    On August 24, 2021, the Department of Education issued a letter to educators nationwide, including USU, that the Department would "immediately cease" enforcement of the provision and that "a decision-maker at a postsecondary institution may now consider statements made by parties or witnesses that are otherwise permitted under the regulations, even if those parties or witnesses do not participate in cross-examination…"

---

[70] *Supra* note 41.

4859-5993-3188.v1

132.    Completely ignoring this critical development in Title IX law, on August 13, 2021, Hilary Renshaw emailed Kaytri about some logistics of the record, as well as the following:

Information about Witnesses

Additionally, I am reaching out to your witnesses to provide them information about the upcoming hearing and ask if they will attend, *if you provided our office with an email address* for the witness. If you have not provided their email address and would like me to email them, please provide that to me within the next 3 business days. As a reminder, if a party or witness indicates they will not attend the hearing, or the witness has never engaged with our office so there is not an indication they will attend the hearing, or does not answer questions at the hearing, their statements will be excluded from the Record provided to the Hearing Panel and will not be considered at the hearing. Additionally, a witness who does not indicate their intent to attend the hearing before the final investigation report is issued as indicated below, their statements will be excluded from the Record provided to the Hearing Panel and will not be considered at the hearing. Therefore, their statements will not be included in evidence that is used to determine whether or not Respondent has committed a policy violation.

133.    USU did not change its policies to comply with the federal court ruling, nor the Department of Education guidance.

134.    USU did not inform Kaytri that she need not attend the hearing or be subject to cross-examination in order for her evidence and prior statements to be considered, pursuant to the federal court's order.

135.    USU did not inform Kaytri that the evidence from her Code-R and police reports could be considered even if Kaytri was unable to compel those witnesses to attend the hearing.

136.    USU allowed Kaytri to go *months* believing that she would have to endure the incredibly traumatic process of being cross-examined by her assailant's attorney, without her own legal representation, at a hearing in which she believed much of her evidence would not be admissible anyway because the witnesses would not be present.

4859-5993-3188.v1

137.     With all those considerations in mind and suffering greatly mentally, on October 28, 2021, Kaytri emailed Hilary Renshaw that the hearing would be too difficult for her and that she did not wish to attend.

138.     Hilary Renshaw responded:

Thank you so much for reaching out. I am sorry to hear how difficult this process is. According to our procedures, when a Claimant is no longer participating in the Grievance Process; or the Office of Equity has no way to gather evidence sufficient for a Determination, then the office may dismiss the formal complaint. If you do not participate in the hearing, then all the testimonial evidence you provided will not be used in the Record for the hearing panel to make a determination. *Given this, if you do not attend the hearing, it is likely the formal complaint (and therefore the case) is dismissed.*

139.     On November 3, 2021, Kaytri received an "Office of Equity Dismissal of Formal Complaint," in which the Office stated that "[n]o Complainant is identified and/or specific circumstances prevent the University from gathering evidence sufficient to reach a determination as to the Formal Complaint or the allegations therein."

140.     All of Kaytri's testimonial evidence, the Draft Reports, the Final Reports, the Appeal Panel findings, the police report, and the Code-R examination were still relevant and admissible and could have legally been considered.

141.     Kaytri was denied a hearing because USU deliberately ignored binding federal law, failed to modify its policies to comply with the law and Department of Education guidance, deliberately enforced a provision that had been vacated and deemed arbitrary and capricious, and failed to notify a rape victim of her rights.

## **FIRST CAUSE OF ACTION**

### **Deliberate Indifference Under Title IX**

142.    Plaintiff incorporates and realleges the allegations of each of the preceding paragraphs as if fully set forth herein.

143.    As set forth above, from December 2019 and continuing forward, USU had actual knowledge of Plaintiff's rape, her assailant's significant wrongdoing, and serious and credible allegations against him.

144.    While USU did begin an "investigation," it consisted of multiple investigators, was not trauma-informed, information and interviews were lost, and it took nearly two years.

145.    A USU Title IX investigator told Kaytri to consider going to another school.

146.    Despite the investigation finding that Plaintiff's assailant had violated sexual assault policy by a preponderance of the evidence and the Appeal Panel concluding the same, USU then allowed Plaintiff to go five months without any contact or updates about the proceedings.

147.    Plaintiff had to take it upon herself to email literally anyone with any administrative power over the situation in order to get an answer, at which time the USU President vacated the Appeal Panel findings and remanded the case to start anew.

148.    After the Informal Resolution was not successful, USU improperly subjected the proceedings to new policies that were detrimental to Plaintiff, including a cross-examination mandate for any witness with evidence to be considered, even though her case originated far before those policies took effect.

149.    USU put the burden on Kaytri to secure the attendance of her own witnesses and to obtain evidence (Code-R photographs) she had no power to obtain.

150.    Despite a federal court clearly vacating the provision of the polices that would have made Plaintiff's prior statements, Plaintiff's Code-R examination, and police reports about the incident inadmissible without being subject to cross-examination, USU *deliberately ignored* federal law and held Plaintiff to illegal, arbitrary, capricious, and traumatizing procedures.

151.    USU allowed Plaintiff to believe for months that she would be held to the old, illegal policies about cross-examination and the inability to admit her relevant evidence if she could not procure witnesses that she had no power or authority to summon to her proceedings.

152.    When Plaintiff expressed that the hearing (believing in which the old policies would apply) would be too difficult for her, USU deliberately, illegally, and improperly dismissed Plaintiff's case, despite there being an abundance of admissible relevant evidence with which it could have made a fair determination about Plaintiff's sexual assault, held her assailant accountable, and acted to protect other students from this assailant's behavior.

153.    As a result of USU's failure to not only respond in a reasonable manner to known harassment, but its deliberate misapplication of law and proper policies to Plaintiff's great detriment, Plaintiff was deprived of educational benefits and opportunities provided by the school.

154.    Plaintiff's grades have suffered dramatically.

155.    Plaintiff does not feel safe at campus, has had to drop courses, and has been precluded from attending certain parts of campus and campus events due to her safety concerns.

156.    USU was deliberately indifferent to binding law and policies, improperly and illegally denied Plaintiff a hearing, and acted clearly unreasonably.

4859-5993-3188.v1

157.    Plaintiff has suffered damages as a result of USU's deliberate indifference, including but not limited to mental and emotional distress, medical expenses, and lost educational opportunities.

## SECOND CAUSE OF ACTION

### Retaliation Under Title IX

158.    Plaintiff incorporates and realleges the allegations of each of the preceding paragraphs as if fully set forth herein.

159.    Plaintiff engaged in protected activity under Title IX when she filed a complaint with USU's Title IX Office.

160.    USU was aware that Plaintiff had made Title IX a complaint, and that such complaint constituted a protected activity.

161.    Despite this knowledge, USU took adverse action against Plaintiff.

162.    USU unnecessarily changed the applicable policies governing Plaintiff's matter mid-process, to policies that were far more detrimental to Plaintiff.

163.    After a federal court clearly struck down part of the new policies, USU illegally held Plaintiff to the new policies (deemed to be arbitrary and capricious) and dismissed her case entirely when she stated she could not emotionally handle the hearing, given the rules USU told her would apply.

164.    USU's retaliation against Plaintiff when she was most vulnerable constituted what is known as institutional betrayal—when a trusted and powerful institution acts in a manner that "visit[s] harm upon those dependent on [the institution] for safety and well-being."[71]

165.    Institutional betrayals of the kind Plaintiff experienced due to USU's actions "exacerbate the impact of traumatic experiences," in a similar manner to betrayal by a trusted person.[72] Rather than aiding a student who had experienced the trauma of sexual assault and turned to the school for help, USU betrayed her trust and magnified her pain.

166.    Plaintiff has suffered damages as a result of USU's retaliation against her, including but not limited to mental and emotional distress, medical expenses, and lost educational opportunities.

## THIRD CAUSE OF ACTION

### Disparate Impact Under Title IX

167.    Plaintiff incorporates and realleges the allegations of each of the preceding paragraphs as if fully set forth herein.

168.    USU has a documented history of leniency toward male athletes alleged to have engaged in criminal activity.

169.    The USU Title IX office and head football coach have facilitated meetings between local and campus law enforcement and the football team in order to give these athletes special access to law enforcement if they get into trouble.

---

[71] Smith, C. P., and Freyd, J.J., *Institutional Betrayal*, 69 Am. Psychol. 6, at 575 (2014), *available at* http://dynamic.uoregon.edu/jjf/articles/sf2014.pdf.
[72] *Id.* at 577.

31

170.    Leniency toward male athletes per se disparately impacts female students complaining of sexual harassment, as in Plaintiff's case.

171.    Thus, USU's effective policies of leniency toward male athletes lack substantial justification.

172.    Plaintiff has suffered damages as a result of the disparate impact of USU's policies.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment against Defendant as follows:

1.    For judgment in Plaintiff's favor and against Defendant for USU's deliberate indifference as prohibited by Title IX;

2.    For judgment in Plaintiff's favor and against Defendant for USU's retaliation as prohibited by Title IX;

3.    For judgment in Plaintiff's favor and against Defendant for the disparate impact of USU's policy of leniency toward male athletes as prohibited by Title IX;

4.    For an award of compensatory damages in favor of Plaintiff and against Defendant USU, including damages resulting from emotional distress, in an amount to be determined at trial;

5.    For an award of special damages in favor of Plaintiff and against Defendant USU for expenses arising out of USU's violations of Title IX, including but not limited to medical and therapy expenses, and the cost of tuition and other school fees paid by Plaintiff during semesters in which USU's actions denied Plaintiff the benefits of the school's education programs;

6.    For injunctive relief, pursuant to the Title IX disparate impact theory, in the form of USU ceasing any and all policies of leniency for male athletes;

7.    For an award of reasonable attorneys' fees and costs associated with this action;

4859-5993-3188.v1

8.      For an award of post-judgment interest as allowed by law;

9.      For such other and further relief as the Court may deem just.

### JURY DEMAND

Plaintiff demands a trial by jury on all causes of action.

DATED this 14th day of December, 2021.


/s/ Michael W. Young
MICHAEL W. YOUNG
LAUREN M. HUNT
PARSONS BEHLE & LATIMER

*Attorneys for Plaintiff*